**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**BRIAN ISRAEL,**

               **Plaintiff,**          **8:08-cv-1112
                                                             (GLS/DRH)**

               v.

**JANET NAPOLITANO,**[1] as Secretary of
the Department of Homeland Security, by
and through the U.S. Bureau of Border
and Customs Protection,

               **Defendant.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **FOR THE PLAINTIFF:** | |
| Office of Stephen G. DeNigris | STEPHEN G. DENIGRIS, ESQ. |
| 2100 M Street, N.W. | |
| Suite 170-283 | |
| Washington, DC 20037-1233 | |
| | |
| **FOR THE DEFENDANT:** | |
| HON. RICHARD S. HARTUNIAN | BARBARA D. COTTRELL |
| United States Attorney | Assistant U.S. Attorney |
| 445 Broadway | |
| James T. Foley U.S. Courthouse | |
| Albany, NY 12207-2924 | |

**Gary L. Sharpe
District Court Judge**

## MEMORANDUM-DECISION AND ORDER

---

[1] On January 21, 2009, Janet Napolitano became the Secretary of the Department of Homeland Security.  Pursuant to FED. R. CIV. P. 25(d), Janet Napolitano is substituted for Michael Chertoff as the defendant in this suit.

## I. Introduction

Plaintiff Brian Israel commenced this action against defendant Janet Napolitano, Secretary of the Department of Homeland Security (DHS), under Title VII of the Civil Rights Act of 1964[2] and the Civil Rights Act of 1991,[3] alleging employment-related discrimination based on religion. (*See generally* Compl., Dkt. No. 1.) Pending is Napolitano's motion for summary judgment. (Dkt. No. 15.) For the reasons that follow, the motion is denied.

## II. Background

Plaintiff Brian Israel is a Canadian born, naturalized American citizen who is Jewish. (*See* Compl. ¶ 16, Dkt. No. 1.) Following a one-year appointment from May 1998 to May 1999, Israel was employed by DHS from August 25, 2002, to July 10, 2007. (*See id.* at ¶¶ 7-9.) During this time, Israel worked as a Customs and Border Protection (CBP) Officer at the International Port of Entry at Champlain, New York. (*See id.* at ¶ 7.)

Over the course of his employment, Israel alleges that he was subjected to repeated anti-Semitic harassment by his coworkers and

---

[2] 42 U.S.C. § 2000e, *et seq.*

[3] 42 U.S.C. § 1981a.

2

supervisors.  (*See id.* at ¶¶ 19-23.)  Specifically, during his first year-long employment, Nazi swastikas and Waffen-SS lightning bolts were affixed to Israel's work locker.  (*See id.* at ¶ 19.)  And according to Israel, DHS performed an internal affairs investigation of this incident but failed to take any corrective action.  (*See id.* at ¶ 20.)  Following the conclusion of Israel's temporary employment, but prior to his rehiring, management at the Champlain Port of Entry allegedly made disparaging remarks about Israel in an attempt to prevent him from being rehired.  (*See id.* at ¶ 21.)

After Israel was rehired in 2002, his coworkers and supervisors continued to harass and insult him based on his Jewish heritage.  According to Israel, buses carrying groups of Hasidic Jews would regularly travel through the Champlain Port of Entry from Montreal to New York, to which his coworkers and supervisors would refer as "the Jew cruiser," the "Hanukkah Harry bus," "the Jew bus," "the smelly Jew bus," and "Harry the Herdsman's bus."  (*See* Pl. SMF ¶ 15, Dkt. No. 24 (citing Pl. Ex. A, Israel Dep. at 44-54, Dkt. No. 24:1).)  While being subjected to these references, Israel was further told by his supervisors to go out and handle the bus since the occupants "are [his] people" and that "maybe [he] will find [himself] a bride."  (*See id.*)  In addition, Israel alleges that he has been

3

ridiculed for his association with Rabbi Mayer Birnhack, chaplain for the New York Police Department and Department of Defense Police. (*See id.* (citing Pl. Ex. A, Israel Dep. at 52, Dkt. No. 24:1).) Lastly, Israel testified to overhearing a fellow officer, William Prudhon III, say that he "jewed the Jew bastard down, that Jew bastard." (Pl. Ex. A, Israel Dep. at 49-50, Dkt. No. 24:1.)

On January 2006, Israel complained to his local union President, Thomas O'Keefe, and met with and complained to the Champlain Port of Entry Director, Christopher Perry. (*See* Pl. SMF ¶ 15, Dkt. No. 24.) However, according to Israel, Perry did not take any action to address his complaints. (*See id.*)

In January 8, 2007, the CBP Office advised Israel by letter that it was proposing his removal for misconduct. (*See* Def. SMF ¶ 14, Dkt. No. 15:2 (citing Def. Ex. A-4b, Dkt. No. 16:1).) Specifically, based on three incidents that occurred on May 7, 2005, July 2, 2005, and January 4, 2006, the CBP charged Israel with "Conduct Unbecoming an Officer," "Failure to Follow Supervisory Instructions," and "Lack of Candor." (*See id.* at ¶¶ 1, 7, 12, 14.) On April 4, 2007, Israel appeared before James T. Engleman, Director of Field Operations, to dispute these charges. (*See id.* at ¶ 14.) Engleman

4

thereafter sent to Israel a letter dated July 9, 2007, in which he concluded that removal was warranted. (*See id.* (citing Def. Ex. A-4a, Dkt. No. 16:1).) Engleman's decision then became subject to review by the CBP's Merit Systems Protection Board.

On July 23, 2007, Administrative Judge JoAnn M. Ruggiero issued a notice to Israel informing him that she would be reviewing his removal. (*See* Def. Ex. B, Dkt. No. 16:3.) A hearing was subsequently held from March 5 to March 7, 2008, after which Judge Ruggiero issued a decision affirming Israel's removal. (*See* Def. Ex. E, Dkt. No. 17:3.) Israel subsequently filed a petition for review with the full Merit Systems Protection Board, which was denied. (*See* Def. Ex. F, Dkt. No. 17:4.) Both the Board and Judge Ruggiero notified Israel that he could file either a petition with the Equal Employment Opportunity Commission (EEOC) or a civil action in federal court.

On August 27, 2008, Israel filed a petition with the EEOC, seeking review of the Board's final decision. (*See* Def. Ex. G, Dkt. No. 17:5.) The EEOC denied Israel's petition and issued a right-to-sue letter. (*See id.*)

On October 17, 2008, Israel brought suit against defendant Michael Napolitano for religious discrimination. (*See* Compl., Dkt. No. 1.) In

5

asserting this claim, Israel sought actual and compensatory damages, reinstatement, attorneys' fees and costs, and injunctive relief. (*See id.* at 7.) Following discovery, Napolitano moved for summary judgment.[4] (*See* Dkt. No. 15.)

## III. Standard of Review

The standard for the grant of summary judgment is well established, and will not be repeated here. For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle*,

---

[4] In addition to challenging the merits of Israel's claim of discriminatory discharge, Napolitano also raises questions as to the proper scope of review of Israel's claims, the timeliness of his claims, and whether Israel exhausted his intra-agency and administrative remedies. (*See* Def. Mem. of Law at 8-13, Dkt. No. 15:3.) First, insofar as Napolitano is contesting the scope of the court's review, (*see id.* at 11), there is nothing in Israel's pleadings or other submissions to suggest that he is seeking review of the administrative proceedings held or the conclusions reached by Director Engleman, Judge Ruggiero, or the Merit Systems Protection Board. Accordingly, the court will not be reviewing or evaluating any non-discrimination claims which were resolved during the administrative process.

Second, although Napolitano is technically correct that discrete acts falling outside the 300-day limitation period set out under 42 U.S.C. § 2000e-5(e)(1) may not in general form the basis of a discrimination claim, (*see id.* at 11-13 (citing, inter alia, *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)), untimely discriminatory acts can constitute relevant background evidence to support an otherwise timely claim, (*see* Pl. Resp. Mem. of Law at 7, Dkt. No. 25 (citing *Morgan*, 536 U.S. at 113)). *See, e.g., Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 176-77 (2d Cir. 2005). In light of Israel's concession that he is not asserting a separate claim for hostile work environment, (*see id.*), the court is satisfied that Israel's lone claim for discriminatory discharge was filed in a timely manner with both the EEOC and this court. *See McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 213 (2d Cir. 2006).

And third, while Napolitano seems to limit his argument regarding administrative exhaustion to acts alleged to have occurred before Israel's removal, (*see* Def. Mem. of Law at 12-13, Dkt. No. 15:3), the court regardless is satisfied that Israel fully complied with the mandatory administrative process and therefore exhausted his administrative remedies as to his discriminatory discharge claim.

Accordingly, the court limits the remaining analysis to the substance of Israel's discriminatory discharge claim.

6

499 F. Supp. 2d 192, 194-95 (N.D.N.Y. 2007). In the fact-intensive context of a discrimination action, "direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001); *see also Gallo v. Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994) ("A trial court must be cautious about granting summary judgment to an employer when ... its intent is at issue.").

### IV.  Discussion

Under Title VII, it is "an unlawful employment practice for an employer ... to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

In analyzing claims of religious discrimination, courts apply the burden-shifting rules first set forth in *McDonnell Douglas Corp. v. Green*, which place upon the plaintiff the initial burden of making out a prima facie case of discrimination. 411 U.S. 792 (1973); *see also Meiri v. Dacon*, 759 F.2d 989, 994-95 (2d Cir. 1985). A plaintiff must satisfy this burden by

7

showing: "(1) membership in a protected class; (2) satisfactory job performance; (3) termination from employment or other adverse employment action; and (4) the ultimate filling of the position with an individual who is not a member of the protected class." *Farias v. Instructional Sys., Inc.*, 259 F.3d 91, 98 (2d Cir. 2001). The fourth prong may also be satisfied by demonstrating that "the discharge or adverse employment action occurred under circumstances giving rise to an inference of discrimination" based on the plaintiff's membership in a protected class. *Id.* The Second Circuit characterizes the plaintiff's prima facie burden as "minimal." *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005) (citation omitted).

"A plaintiff's establishment of a prima facie case gives rise to a presumption of unlawful discrimination that shifts the burden of production to the defendant, who must proffer a 'legitimate, nondiscriminatory reason' for the challenged employment action." *Id.* at 76 (internal citations omitted). If the defendant proffers a legitimate, nondiscriminatory reason for the challenged employment action, the presumption of discrimination drops out of the analysis, and the defendant "will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably

8

supports a finding of prohibited discrimination." *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

Ultimately, once the burden shifts back to the plaintiff, he must show, without the benefit of the presumption, "that the employer's determination was in fact the result of [religious] discrimination." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). The plaintiff must demonstrate by a preponderance of the evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). This showing may be made "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*; *see also Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1180-81 (2d Cir. 1992). Thus, to avoid summary judgment, "the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." *Holcomb*, 521 F.3d at 138 (internal quotation marks and citation omitted).

9

Here, there is no question that Israel is a member of a protected class. Furthermore, it is clear that he suffered an adverse employment action in being discharged from his position. And as to the fourth prong of the prima facie case, there is abundant evidence from which it could reasonably be inferred that Israel was discriminated against based on his membership in the Jewish faith.

However, the second prong of the prima facie case, "satisfactory job performance," presents a more complicated issue. In establishing "satisfactory job performance," the plaintiff is only required to make a "minimal showing of qualification" by demonstrating that he "possesses the basic skills necessary for performance of the job." *Owens v. N.Y. City Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991) (internal quotation marks and citation omitted); *see also Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 29-30 (2d Cir. 1997) (holding that job performance is analyzed under the employer's criteria for the specific position and not a hypothetical objective standard). Rather than showing "perfect performance or even average performance," the plaintiff is only required to "show that his performance was of sufficient quality to merit continued employment." *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978) (internal quotation

10

marks and citation omitted).  And "[a]lthough misconduct indicates a high likelihood that an employee's performance is not satisfactory ... it is at least theoretically possible that an employee committed some misconduct and yet, in the aggregate, performed satisfactorily."  *Thornley*, 104 F.3d at 29-30.  Thus, "whether misconduct precludes a finding that a plaintiff is qualified for his position depends both on the *kind* of misconduct, i.e. whether it speaks to the plaintiff's competence and job skills, and the *seriousness* of the misconduct, i.e. whether 'in the aggregate' plaintiff still performed his job satisfactorily."  *Ruiz v. County of Rockland*, --- F.3d ----, 2010 WL 2541179, at *4 (2d Cir. June 25, 2010).

     Notably, as highlighted by the Second Circuit in *Ruiz*, while evidence relating to the question of "satisfactory job performance" can oftentimes overlap with evidence relating to the employer's proffered non-discriminatory reason, "the step at which the court considers such evidence is important."  *Id.* at *5.  This is particularly so in cases where, as here, the plaintiff submits evidence suggesting that other employees who engaged in similar misconduct were treated less severely.  This type of evidence normally becomes most relevant in evaluating pretext, after the prima facie case has been established.  *See id.*  Still, the same evidence can be

11

relevant to determining whether the employer's criteria for satisfactory performance is "honestly held." *See id.*

For purposes of the prima facie case, the court is satisfied that Israel has demonstrated satisfactory job performance. His work experience is commensurate. Following his four-year service with the United States Navy and subsequent one-year temporary appointment with the United States Customs Service, Israel joined the United States Treasury Police and served as a Federal Police Officer from August 1999 through June 2002. (*See* Pl. Ex. Q, Admin. Tr. at 598-600, Dkt. No. 24:17.) Thereafter, from June 2002 to August 2002, prior to becoming a CBP Officer, Israel worked for the Federal Air Marshal Service. (*See id.* at 600-01.) During the hearing before Judge Ruggiero, Israel testified to receiving various awards and letters of commendation for his work with the Treasury Police and the CBP. (*See id.* at 604.) In addition, the length of time that Israel held the position of CBP Officer is instructive. Lastly, Napolitano has offered no evidence or argument specifically suggesting that Israel did not perform his job in a satisfactory manner.

Because Israel has established a prima facie case of discrimination, the burden shifts to Napolitano to proffer a legitimate, nondiscriminatory

12

reason for the removal. Napolitano has proffered such a reason, namely, that Israel was removed as a result of his conduct during the three altercations with the public and following an extensive series of Agency investigation and proceedings. Israel must therefore demonstrate that the reasons tendered by Napolitano were but a pretext for discrimination and that the termination was motivated by discriminatory animus.

Here, there is sufficient evidence from which a reasonable factfinder could conclude that Israel's removal resulted from religious discrimination. First, Israel's allegations and testimony illustrate a workplace permeated with anti-Semitic statements, actions, and attitudes. Second, Thomas O'Keefe testified that one of Israel's coworkers, CBP Officer Chris Collins, received nine or ten complaints over a six-month period for abusive and unprofessional behavior and was merely reprimanded by way of a letter placed in his file. (*See* Pl. Ex. P, Admin. Tr. at 495-96, Dkt. No. 24:16.) O'Keefe further testified that CBP Officer Scott Recor only received a ten-day suspension as a result of misconduct. (*See id.*) In conjunction with this testimony, Israel raises potentially legitimate questions regarding the timing of the removal proceedings and whether they were initiated and conducted forthrightly. (*See generally* Pl. SMF ¶¶ 3-15, Dkt. No. 24.)

13

Third, O'Keefe testified to personally hearing and seeing several of Israel's supervisors engage in anti-Semitic conduct. (*See* Pl. Ex. P, Admin. Tr. at 487-92, 498-505, Dkt. No. 24:16.) O'Keefe's testimony reinforces Israel's claims that his supervisors either directly engaged in anti-Semitic behavior or allowed or encouraged such behavior to occur and persist. (*See* Pl. SMF ¶ 15, Dkt. No. 24.) Fourth, O'Keefe stated that Israel repeatedly complained to him about experiencing anti-Semitic behavior, that he told Director Perry and other Agency officials of the misconduct, but that no actions were taken and reporting the alleged incidents "d[id]n't seem to be a fruitful endeavor." (*Id.* at 489, 491-92, 506-07.)

Thus, the evidence amply suggests that the CBP's policies were arbitrarily or inconsistently enforced, and that one of the motivating factors behind Israel's termination may have been discriminatory animus. Accordingly, the court denies Napolitano's motion for summary judgment.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Napolitano's motion for summary judgment (Dkt. No. 15) is **DENIED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-

14

Decision and Order to the parties.

**IT IS SO ORDERED.**

August 23, 2010
Albany, New York

_____
United States District Court Judge